**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHARON LYONS, individually, as guardian of her disabled adult son, JULIUS TERRY, and as next friend of her minor granddaughter, LILLIE SAVAGE, | ) ) ) ) | Case No. 20-cv-03412 |
| | ) | |
| Plaintiffs, | ) | The Honorable John F. Kness, District Judge |
| v. | ) ) | |
| THE CITY OF CHICAGO; Chicago police officers CRAIG M. HAMMERMEISTER (star #4831); GERARDO CALDERON (#17623); ANGEL R. CINTRON (#395); ADAM T. WALLACE (#14953); LEMORNET MILLER (#10424); LONNIE J. JOHNSON (#10137); SGT. SHERMAN JEFFERSON (#2445); REGINALD M. WARD (#9478); CECIL PHILLIPS III (#6657) SEAN T. SMITH (#6749); SGT. NICHELLE S. FRACTION (#1982);  LT. JOHN L. FOLINO (#515); and other, CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | The Honorable Gabriel A. Fuentes, Magistrate Judge

Jury Demanded |
| Defendants. | ) | |

**THIRD AMENDED COMPLAINT**

**Summary**

1.      Plaintiffs, by and through their attorneys, Law Offices of Al Hofeld, Jr., LLC, bring this action against defendants City of Chicago and Chicago police officers pursuant to 42 U.S.C. § 1983 and Illinois state law for needlessly traumatizing a young child and her uncle and grandmother and violating their Constitutional rights, alleging as follows:

2.      Shortly after 6:00PM on Wednesday, February 26, 2020, 55-year-old Sharon Lyons, her 4-year-old granddaughter Lillie Savage, and other family members were at home sick with colds and flu.  Lillie was napping in her grandmother's bed.  Ms. Lyons, who is

1

disabled and in poor health, was talking on the phone and standing in her kitchen just inches from the front entry door to her second-floor apartment.

3. Without knocking or announcing their office on any door or window, Chicago police officers broke open the building's first-floor entry doors, charged up the steps to the second floor, and rammed Ms. Lyon's apartment door once, causing it to break and fly open. Officers had a search warrant for Ms. Lyon's address but not for any named person.

4. Pointing rifles and machine guns at Ms. Lyon's face, head and body, the entry officers screamed, "GET DOWN! GET THE F--- DOWN! GET DOWN!" Fearing for her life, Ms. Lyons instantly complied, dropping to the floor directly in front of her bedroom door (which is next to the apartment front door).

5. In the ensuing minutes, approximately 11 plain-clothed officers entered the apartment, some with black "Ninja"-type masks covering their faces below the eyes.

6. Shortly after entry, one after the other, two officers entered Ms. Lyons' bedroom and pointed their guns directly at four-year-old Lillie who, awakened by the noise, was sitting up in her grandmother's bed, crying and screaming. Ms. Lyons was terrified that Lillie was going to be shot, even accidentally. Officers then left Lillie sequestered in the bedroom by herself in terror for approximately 30 minutes; they refused to allow her to go to her grandmother or her grandmother to go to her initially, and they took no steps to calm or comfort her.

7. At all times, officers' guns were loaded, and their fingers were on the triggers. Ms. Lyons and her family followed all officer instructions from the moment of entry. They did not pose any apparent, actual or possible threat to the officers whatsoever at any time. They repeatedly asked the officers what was going on. Officers ignored their questions. They refused to show or provide a copy of the search warrant until the moment they departed. They

2

were rude, sarcastic, disrespectful, patronizing and laughed at the family's expense. They did not apologize.

8.     Officers also trained their guns on and handcuffed several of Ms. Lyon's family members and detained them on the living room couch while they tossed and searched the family's personal property in every room of the apartment for approximately an hour.

9.     None of the officers were entered plaintiffs' apartment were wearing body worn cameras (BWCs), except for one officer who entered the apartment far too late to capture officers' entry when they pointed guns at plaintiffs. Three other officers on the scene wore BWCs. However, at least two of the four total officers with BWCs turned them on too late to capture key events, and all four of them turned their cameras off too soon. The footage from each BWC ranges from approximately 5 – 20 minutes in length and captures only a small portion of the events. All of these actions were in violation of the BWC mandate in CPD Special Order SO3-14.

10.    In the end, the terror and stress to this innocent family was all for naught – officers did not find heroin or any of the other items referenced in the warrant, and they did not arrest anyone. In other words, this was another in a series of bad search warrants by Chicago police that traumatized yet another innocent, law-abiding family of color, destroying their trust in the police.

11.    Chicago officers again failed to conduct their own investigation in order to independently verify or corroborate information received from an informant that a person named "Blondie" was selling drugs from plaintiffs' apartment.

12.    Officers' actions toward Ms. Lyons and her family were the avoidable product of another sloppy search warrant investigation, and their display of excessive force

violated the family's Fourth Amendment constitutional rights. Officers' display of excessive force was also not a rogue or isolated event: it was undertaken pursuant to the City of Chicago's systemic, unofficial policy of using excessive police force against children, youth and their families in the minors' presence, as elaborated below.

13.     As a direct result of this incident, Ms. Lyons and her granddaughter Lillie now suffer severe, long-term, emotional and psychological distress, including symptoms of Post-Traumatic Stress Disorder.

## JURISDICTION AND VENUE

14.     This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978). This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction of plaintiffs' state law claims.

15.     Venue is proper pursuant to 28 U. S. C. § 1391(b). The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

16.     At all relevant times, plaintiff Sharon Lyons was a disabled, 55-year-old woman residing in her second-floor apartment at 4937 S. Justine St. in Chicago, where she had been living since about 2012.

17.     At all relevant times, plaintiff Julius Terry was a disabled adult male residing with his mother, plaintiff Sharon Lyons, in the second-floor apartment at 4937 S. Justine St. Plaintiff Julius Terry suffers from severe autism.

18.     Plaintiff Julius Terry's claims in this action are brought by plaintiff Sharon Lyons pursuant to Federal Rule of Civil Procedure 17(c)(1)(A).

19. At all relevant times, minor plaintiff Lillie Savage was a 4-year-old girl residing with her father, Timothy Lyons, and grandmother, plaintiff Sharon Lyons, in the second-floor apartment at 4937 S. Justine St.

20. Minor plaintiff Lillie Savage's claims in this action are brought by plaintiff Sharon Lyons as Lillie's "next friend" pursuant to Federal Rule of Civil Procedure 17(c)(2).

21. Plaintiffs are African American.

22. Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

23. At all relevant times, defendant officer Craig M. Hammermeister (star # 4831) was an undercover Chicago police officer assigned to Team E-1 of the Criminal Networks Group Narcotics Division, Bureau of Organized Crime ("Team E-1"). He was the affiant of the complaint for search warrant for 4937 S. Justine, second floor apartment, and he, under the close supervision of Sgt. Nichelle Fraction, conducted the investigation that culminated in the complaint for search warrant and the issuance of the search warrant. Additionally, officer Hammermeister, along with approximately 14 other members of Team E-1, entered plaintiffs' apartment and executed the search warrant.

24. At all relevant times, on information and belief, defendant officers Sean T. Smith (#6749), Angel R. Cintron (#0395), Adam T. Wallace (#14953), Lemornet Miller (#10424), Lonnie J. Johnson (#10137), Sergeant Sherman Jefferson (#2445); Reginald M. Ward (#9478); Cecil Phillips III (#6657), Sergeant Nichelle S. Fraction (#1982); were also undercover Chicago police officers assigned to Team E-1. Along with defendant Hammermeister, these defendants – plus defendant Gerardo Calderon, who had technically cycled off Team E-1

immediately before 02/26/20 but who was nonetheless present with the Team on this date - entered plaintiffs' apartment and executed the search warrant, pointing their firearms at plaintiffs and searching their apartment.  Defendant officer Lieutenant John L. Folino (#515) was the lieutenant who approved officer Hammermeister's complaint for search warrant.

25.     As soon as plaintiffs obtain full identifying information for all involved officers, they will further name and/or refine their identifications of them and their actions (including in a further amended pleading if necessary).[1]

26.     When Chicago police officers executed their search warrant at 4937 S. Justine Avenue, second floor apartment, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

### *Overview:  CPD's M. O. is Excessive Force, Including Against and in the Presence of Children and Youth*

27.     Chicago police officers have a *de facto* policy, widespread practice or *M. O.* of using unnecessarily or excessive force against citizens of color, including children and youth, and against their adult family members in front of the children, which traumatizes them.

28.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using excessive force against citizens, including children.  https://www.justice.gov/opa/file/925846/download at 34. DOJ also found that CPD's uses of force, whether reasonable or unreasonable, disproportionately involve Chicago's citizens and youth of color, especially African-Americans.  (Id. at various).

---

[1] Although defendants provided several-years-old photographs of the officers who executed the search warrants, defendants redacted all height and weight information for each officer, making it more difficult for plaintiffs to match the individuals in the photos with the individuals they remember and whom they see in the brief body camera footage.

6

DOJ also found that CPD's excessive force runs the gamut of specific types of force and includes pointing guns at citizens. (Id.).

29. In addition, the 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained similar or parallel conclusions. Among other things, it concluded that most CPD officers are not trained or equipped to interact with youth. https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf at 55. PATF recommended a number of specific reforms, including training, in order to improve police interactions with youth so as not to traumatize them. (*Id.*)

30. Despite clear, actual notice of these findings, CPD and the City did not subsequently implement any changes in CPD policy, procedure or training in order to remedy or otherwise address officers' practice of using excessive force against or in the presence of children. Further, none of the reforms and new training that CPD did undertake in the wake of the DOJ and PATF reports addressed Chicago police officers' use of excessive force against children.

31. For instance, following the release of the DOJ report in 2017, CPD revised its use of force policy, GO3-02, but did not include any changes that expressly require officers not to refrain from pointing guns at or using force against or in the presence children, when possible, or to otherwise use a trauma-informed approach to the use of force in situations where children are present. Nor did CPD's 16-hour officer training that accompanied implementation of the new use of force policy include any instruction regarding the use of force and children or the pointing of guns at them or others.

32. Similarly, through 2019, CPD did not revise its search warrant policy, SO9-14, or its search warrant training to include any requirements or instruction that officers

refrain from pointing guns at or using force against or in the presence children, when possible, or use a trauma-informed approach to the use of force in situations where children are present.

33. Moreover, in the federal consent decree the City agreed to with the State of Illinois and that was entered by Judge Dow in January, 2019 in *State of Illinois v. City of Chicago*, 17-cv-6260, the City did not commit to any reforms to remedy the problem. http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf

34. Further, unlike other major U.S. metropolitan police departments - such as New York, Cleveland, Indianapolis, Charlotte, Baltimore and San Francisco - CPD still does not have any policy or provide any training on policing children and youth in ways that are trauma-informed and that avoids exposing them to police use of force.

35. In addition, the traumatic and long-lasting impact on children's health from exposure to violence is well-established scientifically and was well-understood by the City of Chicago at all relevant times. Indeed, until approximately 2012 the Chicago Department of Public Health had a program, Chicago Safe Start, that trained officers in two police districts about the impact on young children of exposure to violence. Nevertheless, the City cut and effectively terminated this training and failed to replaced it, even after receiving actual notice of the above findings regarding police and children in the DOJ and PATF reports.

36. In other words, despite the City's extensive knowledge, *via* Chicago Safe Start, that exposure to violence has a traumatic impact on children, CPD never implemented any policy or training to prevent officers themselves from harming children by pointing guns at them or using other unnecessary or excessive force against or in the presence of children.

37.     It was also widely known by CPD, which extensively patrols "high crime" neighborhoods in Chicago, including plaintiffs' Back-of-the-Yards neighborhood, that many poor children of color are traumatized by exposure to violence in their neighborhoods before interacting with police.  In other words, in such neighborhoods CPD officers *expect* to encounter children with a preexisting history of trauma.  Nevertheless, despite this knowledge CPD failed to require or train officers to avoid pointing guns at and otherwise using excessive or unnecessary force against and in the presence of children, with the result that they compounded the trauma of the children they encounter.

38.     On January 3, 2020, in response to over a year of lawsuits and media coverage regarding officers pointing guns at and handcuffing children, CPD revised its search warrant policy and training to nominally require officers to "maintain a sensitive approach and use due care to safeguard the physical and emotional well-being" of any children present "to minimize trauma following the execution of a search warrant."  (SO-19 VIII. E. 3.).  However, both the nebulous policy and the officer training done on the new policy during January and February, 2020, failed to require officers to refrain from pointing guns at or otherwise using excessive or unnecessary force against or in the presence of children. Moreover, CPD has failed to enforce its new policy through appropriate discipline.

## FACTS RELATING TO ALL COUNTS

### *Chicago Police Obtain a Search Warrant for Plaintiffs' Apartment Without Corroborating Alleged Drug Sales There*

39.     At approximately 3:36PM on February 26, 2020, defendant officer Hammermeister swore out and obtained two search warrants.  One authorized a search of the premises at 4937 S. Justine Street, 1st floor apartment.  The other authorized a search of the premises at 4937 S. Justine Street, 2nd floor apartment.  There are only two units in the building.

The warrant for the 1st floor apartment authorized the seizure of cocaine. The warrant for the 2nd floor apartment authorized the seizure of heroin. Neither warrant named any individual person as a target, even though Hammermeister, in the body of the complaints for search warrant, provided a detailed physical description of the person allegedly selling drugs out of both apartments.

40. Officer Hammermeister's complaints for the two search warrants were identical with the sole exceptions of the apartment number and the type of drug sought to be seized. The complaint stated, erroneously and on the basis of unverified information from a criminally active confidential informant ("CI"), that "Blondie," an African-American transgendered woman wearing a blond wig, sold heroin out of the 2nd floor apartment at 4937 S. Justine and sold crack cocaine out of the 1st floor apartment.

41. As the complaints for search warrant indicate, officer Hammermeister did not independently investigate to verify or corroborate the CI's representation that Blondie was selling drugs from plaintiffs' 2nd floor apartment or that she had any connection with plaintiffs or their apartment. Neither did Sgt. Nichelle Fraction, who directly supervised the investigation, nor any other officer who assisted Hammermeister in the investigation.

42. Defendant Hammermeister claims to have purchased drugs earlier the same day, before obtaining the warrant, from a person named "Blondie" in the alley behind Ms. Lyon's apartment building. Even if this were true, it is a far cry from purchasing drugs from someone inside plaintiffs' apartment. In fact, this person had no actual or apparent connection with Ms. Lyons, her family, or their apartment.

43. The facts that a Chicago police officer alleges in a sworn complaint for search warrant are required to be "credible and reliable." (CPD SO4-19, VI.B.a.). To this end, a

10

Chicago police officer presenting a complaint for search warrant to a judge is required to "thoroughly conduct[]" the "investigation leading up to the need for a search warrant." (CPD SO4-19).

44. As the sworn applicant for the warrant, officer Hammermeister had a duty to use diligence to discover and to disclose in good faith to the issuing warrant judge, Judge William H. Hooks, that he had identified the correct apartment or place to be searched (instead of the residence of an innocent citizens, like plaintiffs). This was part of establishing probable cause. It was required because the law holds dear citizens' Fourth Amendment rights, especially those of innocent citizens who are not criminal suspects.

45. In direct violation of both CPD policy and the Fourth Amendment, on information and belief neither officer Hammermeister nor Sgt. Fraction performed *any* independent investigation or surveillance to verify or confirm that "Blondie" was selling drugs from, resided or could be found at 4937 S. Justine, 1st or 2nd floor, as the CI represented.

46. They could have taken simple steps to spare plaintiffs, an innocent family, the trauma of a violent police raid. They could have performed surveillance of the building. They could have attempted to conduct a controlled drug buy directly from plaintiffs' apartment. They did neither – or anything else.

47. Officer Hammermeister and Sgt. Fraction recklessly neglected to conduct their own investigation, as required by SO4-19. They simply trusted what the criminally active CI told them was true about "Blondie" and her connection to 4937 S. Justine, 2nd floor apartment.

48. Consequently, officer Hammermeister's sworn complaints for search warrant were fundamentally inaccurate about who was inside 4937 S. Justine, 2nd floor

11

apartment, and what was actually taking place there. In spite of what he attested to before Judge Hooks, officer Hammermeister did not have probable cause to believe that anyone was selling drugs there and, therefore, to enter and search of plaintiffs' apartment.

49.     Because officer Hammermeister and Sgt. Fraction failed in their minimal duty to independently investigate and corroborate the CI's representation that a "Blondie" was selling drugs from plaintiffs' apartment, theirs was not a good faith error but a reckless one.

50.     In addition, the approving lieutenant, believed to be defendant officer Lt. John Folino, was required to review officer Hammermeister's complaints for search warrant to ascertain that they "clearly indicate[] that an investigation undertaken as a result of the information received validates an assertion of probable cause" and interview Hammermeister for verification and clarification. After doing so, he was supposed to sign his name and star number on the left margin to indicate his review and approval. However, on information and belief, Lt. Folino was not even presented with or, alternatively, did not even review and approve the warrants until *after* they were executed. When he signed them subsequently, he simply "rubberstamped" them, approving a *fait accompli* and defeating the purpose of the supervisor review requirement.

51.     On February 26, 2020, defendant officer Hammermeister and other officers reasonably knew or should have known that no one was selling drugs at 4937 S. Justine, 2nd floor apartment.

52.     Finally, as is customary, defendant officers, before obtaining and executing the search warrant for plaintiffs' apartment, took no steps to: determine whether any minors resided in plaintiffs' apartment; if so, to determine what times they were unlikely to be at home; to avoid entering at times when they were likely to be present; to plan their method of

12

entry so as not to traumatize children; or to deescalate their force tactics if they unexpectedly encountered children in the apartment. As a result, officers injured plaintiff Lillie Savage.

### *Officers Point Guns at 4-Year-Old Lillie and Her Grandmother*

53. On Wednesday evening, February 26, 2020, Sharon Lyons and her family were all sick with colds and flu and resting inside their second-floor apartment, as they had been all day long. They had not had any visitors.

54. Shortly after 6:00PM, Ms. Lyons was standing in the kitchen a couple of feet from the front entry door (which opens into the kitchen) and talking on her cell phone to a neighbor. She heard two loud booms (which, she later learned, were officers entering her neighbor's apartment) followed seconds later by a third boom (the ram on her exterior, first-floor door) and people running up the inside stairs towards her apartment.

55. Next, all in one instant, there was a hard blow to Ms. Lyon's apartment door, the door flew open, a piece of panel or doorframe flew to the floor, the microwave crashed down to the floor, and at least 7 plain-clothes officers rushed in at once and pointed at least one assault rifle with a flashlight on it and several handguns directly at Ms. Lyon's face and screamed, "GET DOWN! GET THE F--- DOWN! GET DOWN!" On information and belief, the officers who entered first and pointed their firearms at Ms. Lyons were Calderon, Cintron, Johnson, Sgt. Jefferson, Ward, Phillips, and Sgt. Fraction. Calderon breached and carried a rifle or long gun. Sgt. Fraction was the supervising officer on the scene.

56. Ms. Lyons did not know at first that the men (and one woman) were police officers because they did not "knock and announce" or say "POLICE" or "SEARCH WARRANT" on any door or window at any point before they broke in and thrust guns in her face.

13

57. A total of approximately 11 plain-clothes officers entered Ms. Lyons' apartment, some of them with black, "Ninja"-type masks covering their faces below the eyes. Officers entered simultaneously through both the front and back doors of the apartment. On information and belief, officer Hammermeister entered through the back door and pointed his firearm at Ms. Lyons.

58. In the first moments of entry, Ms. Lyons saw multiple guns, including at least one assault rifle with a light on it; the light was pointed directly in her eyes, like a flashlight. Calderon carried a rifle or long gun. Several handguns were pointed at her as well. When officers broke open the door, their guns were two-to-three feet from Ms. Lyons' body and pointed directly at her face and head.

59. Ms. Lyons feared for her life. She immediately complied with officers' orders and got down onto the kitchen floor directly in front of her bedroom door (her bedroom opens to the kitchen). Officer Fraction snatched her phone out of her hand and threw it on the kitchen table.

60. When officers first entered the apartment, Ms. Lyons' 4-year-old granddaughter, Lillie, was napping in Ms. Lyons' bedroom. The bedroom door was closed. In response to the commotion outside the bedroom door, Lillie woke up and began crying and screaming for her grandmother.

61. Officers asked Ms. Lyons who was in the bedroom and the age of her granddaughter; she told them. Officers then repeatedly screamed at her to "MOVE!" out of the way so that they could enter the bedroom. When Ms. Lyons was physically unable to get up, two officers lifted her off the floor and set her in a chair near the bedroom door. When officers

14

opened the bedroom door, Ms. Lyons was seated in a chair at the head of the kitchen table near her bedroom and could see both her granddaughter and the officers who entered the bedroom.

62.     Officers were not prepared to deal with a young child.

63.     One of the officers opened Ms. Lyons' bedroom door and entered the bedroom with his handgun drawn and, holding it up in both hands, aimed it straight at Lillie who was sitting up in bed, crying.  The gun was pointed directly at her chest.  The bed is about 5 feet from the bedroom door.  Lillie began to scream and cry more intensely for her grandmother as the gun was pointed at her.  The officer then panned or swept his gun around the bedroom before exiting the room.

64.     Ms. Lyons, who in this moment was devastated and feared for Lillie's life, immediately asked the officer to stop pointing his gun at Lillie.  Officers did not stop.

65.     Next, a second officer entered Ms. Lyons' bedroom with his gun drawn and pointed his gun at Lillie in the same way, looked around the room and exited the room.

66.     On information and belief, Sgt. Jefferson was one of the officers who pointed his firearm at Lillie.  The other officer was Calderon, Ward, Johnson or Phillips.

67.     Despite Lillie's continued crying and screaming for her grandmother, officers, including Sgt. Jefferson, refused to allow Ms. Lyons to go and get Lillie at this point. Ms. Lyons felt lifeless when she was unable to go help Lillie.  Officers also refused to allow Lillie to exit the bedroom and go to Ms. Lyons in the kitchen.

68.     Officers forced Lillie to cry and scream in terror alone in Ms. Lyons' bedroom with the door mostly closed for approximately 25-30 minutes.

69. During the time that Lillie was alone in Ms. Lyons' bedroom, none of the officers made any effort to comfort, calm or re-assure her. Nor did they do so at any time during the raid.

70. Later, when a third officer wanted to enter Ms. Lyons' bedroom in order to search it, he had officer Fraction bring Lillie to Ms. Lyons, who held her on her lap for the duration of the raid, as Ms. Lyons sat on the kitchen chair.

71. Several officers, including but not limited to officer Hammermeister, also pointed guns at Julius, Ms. Lyons' severely autistic son. He was terrified, crying and hysterical. Officers did not seem at all prepared to deal with an autistic person.

72. Simultaneous with officers' initial entry and in response to the commotion, two of Ms. Lyon's sons and her nephew, who live with her, came towards the kitchen from the living room. Several officers pointed guns at them and ordered them to get face-down on the floor. They immediately complied. While they were lying face-down, officers put their guns in their faces, kneed them hard in the back and neck and handcuffed them. The tip of one officer's handgun was touching James Lyons' temple.

73. Next, one after the other, officers took James and Ms. Lyons' nephew, Jerry, alone into a bathroom and questioned them. They asked for their names, who lives in the apartment, where the drugs are, and about someone named "Blond" or "Blondie" in the back alley. They told officers they don't know anyone with that name, they do not sell drugs, everyone is sick, and that officers had the wrong address.

74. At no point did officers say they saw "Blondie" inside Ms. Lyons' apartment or that they saw any member of Ms. Lyons' family outside the apartment that day.

75.     Officers then took the males into the living room and detained them on the couch while at least two officers stood by as guards.  Officers pulled a third son, Timothy Lyons, out his bedroom where he was asleep in bed, sick, handcuffed him, questioned him, and brought him to the living room.  Officers continued to detain Ms. Lyons in the kitchen.  They questioned her throughout the detention.

### A Fruitless Search

76.     Defendant officers Smith, Cintron, Wallace, Miller, Johnson, Sergeant Jefferson, Ward, Phillips, Sergeant Fraction and Hammermeister all entered and searched throughout the entire apartment in all of the rooms, including the bedrooms, the living room, the enclosed back porch, the kitchen, and the pantry.  Officers focused on the back porch, the back bedroom and the pantry (all in the vicinity of the apartment back door).

77.     Officers did not find any heroin or other items listed in the search warrant, and they did not find Blondie.  Officers did not arrest or charge anyone.  Nothing was written on the Evidence Recovery Log.  Nothing was confiscated or inventoried.

78.     Many of the defendant officers also entered and searched the 1st floor apartment and did not find any contraband or arrest anyone there.  Most officers searched in both apartments.

79.     Officers damaged Ms. Lyons' apartment.  Ms. Lyons herself had to pay for two new locks to replace the locks broken by the 7 defendant officers who entered initially, including the lock on the downstairs front entry door leading to her unit.  The officers, including sergeants Fraction and Jefferson, did not give Ms. Lyons any information about how to report the damage to the City or how to ask the City to make or pay for repairs.

17

80. From the first moment officers entered, Ms. Lyons repeatedly asked officers what was going on. They would not give her any information other than saying they had a search warrant. At one point, an officer mockingly and sarcastically shouted in her face, "Oh, I made a sale out of here earlier today by the gate."

81. Officers were inside Ms. Lyons' apartment for approximately 60 minutes.

82. Officers did not show or give Ms. Lyons the search warrant until moments before they left.

83. Along with the search warrant, officers gave Ms. Lyons a blank Evidence Recovery Log with a diagonal line drawn through it (indicating that nothing was found).

84. None of the plain-clothed officers who entered plaintiffs' apartment wore body cameras. At least two uninformed patrol officers who were wearing body cameras entered plaintiffs' apartment but not until *after* Ms. Lyons' sons were already detained on the living room couch, so the cameras did not capture officers' violent entry and their pointing guns at plaintiffs.

85. Throughout the raid, officers spoke to Ms. Lyons in a patronizing tone, as if she and her family were stupid. They screamed and shouted in her face. They cursed, were sarcastic, rude and disrespectful. They treated the family as though they were convicted criminals. Officers also laughed and giggled at times. Two officers joked and laughed in front of her about the broken doorframe from their forced entry - "Damn… Thick-ass panel!"

86. Before they left, officers did not explain that they had made a mistake. They did not apologize.

### *Officers' Use of Excessive Force Against Ms. Lyons and 4-Year-Old Lillie Was Totally Unnecessary*

87.     Plaintiffs presented absolutely no threat, real or apparent, at any time to any of the defendant officers who entered and searched their home.  They did not resist, flee, or look anything like "Blondie."

88.     Officers quickly discovered – within seconds of entering - that no one in the apartment looked anything like the "Blondie" person whom Hammermeister physically described in the search warrant.

89.     Even though plaintiffs presented no threat, defendant officers repeatedly pointed their guns at them, and any who did not point their guns at plaintiffs did not intervene to ask those pointing guns at plaintiffs to stop.

90.     Plaintiffs have been harmed by officers' unnecessary pointing of guns, unlawful detention, unlawful search of their persons and home, and their destruction of their personal property.

***Officers' Unnecessary Uses of Force Traumatized Ms. Lyons and 4-Year-Old Lillie***

91.     Chicago police officers' terrorizing conduct towards plaintiffs caused them immediate, serious and lasting emotional and psychological distress.

92.     Prior to February 26, 2020, Ms. Lyons and Lillie were happy and healthy people in a close, loving family.  They had never had guns pointed at them.  They had never suffered any kind of emotional or psychological trauma of any kind.  This all changed with defendants' actions.

93.     Throughout their encounters with police, both were terrified.  Ms. Lyons was terrified, crying and physically shaking throughout the raid.  Lillie was crying and screaming.  Based upon officers pointing guns directly at them, Ms. Lyons and 4-year-old Lillie were both afraid they were going to be shot.

94.     Ever since the incident, they have continued to re-live, in various ways, how terrified they were that day.

95.     Ms. Lyons no longer feels safe in her apartment.  She could not sleep the night of the incident.  Though she previously had no difficulty sleeping, she has not been able to sleep well since the incident and wakes up several times each night.  She is hypervigilant, paranoid.  She lives with a sense of personal violation.  She does not leave the apartment, except for the grocery store.  During the incident, Ms. Lyons felt helpless and powerless to protect Lillie.  She understands that the gun could have gone off when it was pointed at Lillie.  Since the incident, Ms. Lyons finds herself crying twice a day.  Involuntarily, she goes over the incident again and again in her mind, reliving the scenes and the emotions.

96.     Since the incident, 4-year-old Lillie, who sleeps in the bed with her grandmother, has been jumping in her sleep and cannot be still.  She's also been having bad dreams.  Prior to the incident, she slept peacefully and rarely had bad dreams.  So far, she refuses to talk about the incident with her family and acts withdrawn.

97.     Plaintiffs now feel nervous, jumpy, and "on edge."

98.     Plaintiffs continue to experience and exhibit, unabated, these and other signs of serious emotional and psychological trauma and distress.

99.     On information and belief, plaintiffs have, or have many of the symptoms of, Post-Traumatic Stress Disorder.

100.    As a direct result of officers' conduct, plaintiffs are now being medically assessed for trauma inflicted by the Chicago police.

20

101. On information and belief, plaintiffs will require counseling in order to cope with the long-term, psychological injuries inflicted by defendants' display of excessive force.

102. Officers' shocking actions of repeatedly pointing and training loaded guns at close range on a 4-year-old child and her granddaughter constituted serious abuses of power and authority.

103. Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards a 4-year-old child and a disabled grandmother.  Plaintiffs' sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

104. Officers' conduct was undertaken pursuant to and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of excessive force noted above, which includes the use of excessive force against and/or in the presence of children of color.

**COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM**
**AGAINST THE CITY OF CHICAGO**
**(Minor Plaintiff Lillie Savage)**

105. Minor plaintiff Lillie Savage re-alleges all paragraphs 1-104 above, including the *Monell*-related allegations of paragraphs 27-38 and 104 above, and incorporates them into this count.  She asserts this claim, through her father, against defendant City of Chicago.

106. Defendant officers' use of excessive force against Lillie was directly and proximately caused by one or more of the following four, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, and *de facto* policies, widespread practices,

21

and/or customs of the City of Chicago:  1) a pattern and practice of using unnecessary or excessive force against citizens, including children and youth; 2) a failure to have any policy about when it is appropriate for officers to draw their guns and point them at citizens, including children; 3) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against citizens, including children and youth and/or their close relatives in the minors' presence; and 4) an absence of official policy and training for officers to refrain from pointing guns at or otherwise using excessive or unnecessary force against or in the presence of children.  Each of these policies existed for more than six years prior to February 26, 2020 ("the *Monell* period") and was the moving force behind the officers' conduct that resulted in the violation of Lillie's constitutional rights and the direct causal link between the City's actions/inaction and the deprivation of her rights.

107.    First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force against citizens, including children and youth.

108.    Of the hundreds of citizen misconduct complaints filed with BIA, IPRA and COPA during the *Monell* period that involved allegations of officer excessive force against a young child or youth, including pointing guns at them, none were sustained, none resulted in any officer discipline, and the vast majority of complaints were not even investigated.  Moreover, as the DOJ found, all excessive force complaints, including those involving the unjustified pointing of guns, were inadequately investigated, rarely sustained, and even more rarely disciplined.

109.    This set of City's widespread practices or customs directly encouraged, sanctioned, authorized and was the moving force behind officers' conduct towards Lillie.  The City's historical failure, leading up to February 26, 2020, to properly intervene in, investigate

22

and discipline officer excessive force, especially excessive force against or in the presence of children and youth, sent officers the clear message that they had a general freedom and license to engage in excessive force, including excessive force against children, without fear of being corrected, investigated or disciplined. This caused defendant officers to act without appropriate restraints towards Lillie.

110. The City had actual and constructive notice during the *Monell* period of each of these failures of official accountability from a) a long-standing, continual stream of citizen excessive force misconduct complaints to IPRA and COPA that were not properly investigated as well as from b) the specific conclusions reached by and the data contained in the 2017 DOJ and the 2016 PATF reports (see *supra*).

111. Second, contrary to commonly accepted standards and best practices in law enforcement, CPD failed to have any official policy, guidance or training regarding when it is appropriate for officers to draw their service weapons, have their guns out, and point them at citizens, including and especially children. In fact, CPD has long refused and still refuses to refer to an officer pointing a gun at someone as "a use of force." These failures gave officers official legal sanction and free reign to point their guns at citizens, including children like Lillie, without any official restraint or consequences.

112. Third, defendant officers' conduct towards and in the presence of Lillie was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to refrain from pointing guns at and otherwise avoiding the use of excessive or unnecessary force against or in the presence of children or youth when possible.

113.    Even after the DOJ and PATF findings regarding force and children were known to final City policy makers in 2016 and 2017 – constituting actual notice to the City - the City failed to implement any reforms to remedy the pattern and practice of excessive force against or in the presence of children and youth.  This failure amounted to a deliberate and conscious choice not to take action to prevent future violations of people's constitutional rights, including Lillie's.  In other words, in the wake of the DOJ and PATF findings, the City opted not to adopt any reforms despite the known and obvious risk that the pattern of excessive or unnecessary force noted by DOJ and PATF would lead to constitutional violations in the future. The City knew that, without reforms, children's rights would continue to be violated.  Thus, the City's failure to implement reforms was a foreseeable cause of Lillie's injuries.  In particular, the City's decisions not to reform official policies and training include, without limitation:

a.    The continued absence of any provision in CPD's official use of force policy that would require or guide officers to refrain from pointing guns at or using excessive or unnecessary force against or in the presence of children and youth or to use a trauma-informed approach to the use of force in situations where minors are present and some force may necessary;

b.    CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit requirement or guidance that officers should refrain from pointing guns at or otherwise avoid using excessive or unnecessary force against or in the presence of children and youth or to use a trauma-informed approach to the use of force in situations where minors are present and some force may be necessary;

24

c.       CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether minors reside in the residence, (ii) to avoid entry and search at times when minors are likely to be present (iii) to plan manner of entry and force tactics based on whether minors are expected to be present; (iv) to de-escalate themselves or change tactics when they unexpectedly encounter children or youth, and/or (v) to take other precautions to avoid traumatizing minors and their close relatives, such as avoiding pointing guns at or placing parents and caretakers in handcuffs in the children's presence;

d.       CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered to provide or draft model use-of-force policies that included explicit provision for avoiding excessive or unnecessary use of force against and in the presence of children;

e.       City's refusal or failure, despite its extensive knowledge, *via* Chicago Safe Start, of the traumatic effect of exposing children to community violence, to continue, expand, or reinstate any training to prevent officers themselves from harming children by pointing their guns at them or otherwise using excessive or unnecessary force against them or in their presence;

f.       City's and CPD's refusal or failure to propose or commit to, in the consent decree it negotiated and is now implementing in *State of Illinois, v. City of Chicago*, 17-cv-6260, any explicit protections for children from officers who would point their guns at them or otherwise not refrain from using excessive or unnecessary force against them and any provisions requiring a trauma-informed approach to policing children.

114.    The continual streams of excessive force complaints to IPRA and COPA, including those in which children were complainants or victims, also constituted actual and constructive notice to the City of a pattern and practice of excessive force that required remedial action.

115.    Fourth, the City's lack of official policies to protect citizens, including children from officers pointing guns at them and other excessive or unnecessary force, combined with its failure to hold accountable officers who use excessive force, have resulted in a *de facto* City policy and practice of using unreasonable force against citizens, including children and youth, as concluded by DOJ and PATF.  This widespread practice was the moving force and direct causal link behind the officers' pointing of guns at Lillie on February 26, 2020.  The excessive force used against Lillie was an example of and result of this *de facto* policy.

116.    Similar incidents of excessive force against children are the direct and foreseeable result of the same set of City policies.  For example, on August 29, 2013, Chicago police officers of the Area Central Gun Team executed a search warrant at 930 N. Keystone Avenue in Chicago for a person with no connection to the residence and pointed a rifle with a laser light directly at the chest of 3-year-old Davianna Simmons and pointed a handgun at her grandmother Emily Simmons' head in front of Davianna when neither presented any threat to officers.  The Simmons are African-American.  The officers were never investigated or disciplined for the incident.

117.     On January 29, 2015, while executing a search warrant at 1856 S. Lawndale, 2nd floor apartment, in Chicago for a person who had long been incarcerated (because officers failed to check the CPD CLEAR system or public records), Chicago police officers of Narcotics Unit 189 and the SWAT Alpha team pointed their assault rifles directly at brothers

Justin and Jeremy Harris and Jaden Fields, ages 4, 6 and 11, respectively, and at their mother, Jolanda Blassingame, when the family did not pose any apparent threat to officers. Ma. Blassingame and her children are African-American. The officers were never investigated or disciplined for the incident.

118. On November 7, 2017, while executing a search warrant at 3557 S. Damen Avenue, 2nd floor, in Chicago for a target who actually lived in the building's *3rd floor* apartment, a group of patrol officers pointed a handgun and an assault rifle directly at 5- and 9-year-old Jack and Peter Mendez and their parents, Hester and Gilbert Mendez, when none of them presented any apparent threat to officers. The Mendez family is Latino. The officers have not been investigated or disciplined for the incident.

119. On August 9, 2018, while executing a search warrant at 5033 S. Hermitage, 1st floor apartment, in Chicago for a person with no connection to the apartment or the residents (he was apprehended next door), members of the Area South Gun Team and the Alpha SWAT team pointed assault rifles at a 4-year-old girl, Lakai'Ya Booth, her 8, 11 and 13-year-old siblings, and their mother and grandmother, Ebony Tate and Cynthia Eason, when none of them presented any apparent threat to officers. Ms. Tate, her children and mother are African-American. The officers have not been investigated or disciplined for the incident.

120. On March 15, 2019, while executing a search warrant at 8914 S. Laflin in Chicago, members of the 7th District Tactical Team and the SWAT Alpha Team pointed assault rifles at 6, 8, and 9-year-old Royalty, Royal and Roy Smart and their mother, Domonique Wilson, as they walked from their house to the street with their hands up and then handcuffed 8-year-old Royal for approximately 40 minutes when none of them presented any apparent threat

to officers. Ms. Wilson and her children are African-American. The officers have not been investigated or disciplined for the incident.

121. On December 25, 2019, while investigating a robbery in Rogers Park, Chicago patrol officers entered a family's condominium at 1227 West Albion Avenue in Chicago without authorization and pointed handguns at 13-year-old Lazerick James, handcuffed one of his wrists, and dragged him through the apartment for several minutes before realizing their mistake, apologizing and departing. Lazerick is African-American. He did not pose any threat to officers' safety. The officers have not been investigated or disciplined for the incident.

122. Through their combined failures above, before and after actual and constructive notice, to enact official reforms that protect children from excessive and unnecessary force and to hold accountable officers who use excessive force against them or in their presence, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA"), the Civilian Office of Police Accountability ("COPA") or the City of Chicago Inspector General ("IG"). These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of Lillie, providing them a general license to use excessive force, including excessive force against minors, whenever it suited them.

123. Thus, through their combined failures, before and after actual notice, to enact official policies protecting citizens, including children, from excessive or unnecessary force and to hold accountable officers who use excessive force against or in the presence of children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the IG, the Mayor, and the

28

Chicago City Council – condoned, approved, authorized, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of children and youth.

124. Finally, during all times relevant to the incident involving plaintiffs, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children and youth and/or their close relatives in the minor's presence. Defendant officers' conduct toward Lillie, including their failure to intervene and failure to report the actions of their colleagues, was the direct and foreseeable result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

125. By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of excessive or unnecessary force, including against or in the presence of children and youth, defendant City of Chicago has manifested conscious and deliberate indifference to the deprivation of Lillie's constitutional rights.

126. One or more of these four official policies, failures of official policy, practices and customs collectively, were the moving force behind defendant officers' conduct that directly and proximately caused the violations of Lillie's constitutional rights set forth above and below, such that the City of Chicago is liable for officers' conduct.

### The City of Chicago's <u>De Facto</u> Policies Resulted in Violations of Plaintiff's Constitutional Right to be Free of Excessive Force

127. Officers' conduct toward plaintiff constituted excessive force, in violation of her rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

29

128. Under the circumstances, officers' pointing of guns at Lillie and other displays of force against and in the presence of Lillie were totally unnecessary, unreasonable and unjustifiable.

129. Under the circumstances, officers' uses of force against and in the presence of Lillie, undertaken in the presence of and witnessed by other plaintiffs, were totally unnecessary, unreasonable and unjustifiable.

130. Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Lillie's constitutional rights.

131. Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

132. The officers' misconduct was undertaken pursuant to and as the direct, foreseeable and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of excessive force against and in the presence of Lillie.

133. Further, no officer present on the scene intervened to stop officers from pointing guns at Lille. One or more officers had a reasonable opportunity to prevent or stop the violations of Lillie's constitutional rights but stood by and failed to take any action.

134. As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

135. Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

30

136. As the direct and proximate result of officers' misconduct, Lillie has suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

### COUNT II – EXCESSIVE FORCE – 42 U.S.C. § 1983

137. Plaintiffs re-allege paragraphs 1-26 and 39-103 above and incorporate them into this count. They assert this claim against defendant officers Calderon, Cintron, Fraction, Hammermeister, Jefferson, Johnson, Phillips, and Ward, each of whom pointed a firearm directly at plaintiffs at close range during the February 26, 2020 raid, and each of whom is already an existing defendant.

138. These defendant officers' conduct towards plaintiffs—i.e., pointing an assault rifle and several handguns directly at Ms. Lyon's face from 2-3 feet away even though she was disabled and clearly posed no safety threat; pointing firearms directly at 4-year-old Lillie's chest as she sat in bed, crying for her grandmother, even though she clearly posed no safety threat; pointing firearms directly at Julius Lyons, who is severely autistic, even though he clearly posed no safety threat—constituted excessive force, in violation of plaintiffs' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. Under the circumstances, defendants' use of force was totally unnecessary, unreasonable, and unjustifiable.

139. Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to plaintiffs' constitutional rights. One or more defendant and/or nondefendant officers had a reasonable opportunity to prevent or stop the repeated vilations of plaintiffs' constitutional rights alleged in this count but stood by and failed to take any action despite opportunities to do so.

140. Defendants' misconduct was undertaken with malice, willfulness, and reckless indifference to the rights of others.

141. As the direct and proximate result of defendants' misconduct, plaintiffs have suffered and will continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

142. Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs. Defendant officers' shocking displays of force against a totally unarmed family constituted an abuse of power and authority. Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

143. Defendant officers' conduct towards plaintiffs was undertaken with willful and wanton disregard for the rights of others. Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved. Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

144. In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

### **COUNT III – UNLAWFUL SEARCH – INVALID WARRANT – 42 U.S.C. § 1983**
### **(All Plaintiffs)**

145. Plaintiffs re-allege paragraphs 1-26 and 39-103 above and incorporate them into this count. They assert this claim against defendant officers Calderon,

Hammermeister, sergeant Fraction, Lieutenant Folino, and any other defendant officers known and unknown who participated in obtaining the search warrant for their apartment.

146. These defendant officers unreasonably and recklessly approved, obtained and executed a search warrant for a person who, officers knew or should have known, had no connection with plaintiffs' address, a fact which invalidated the warrant from the start, prior to execution.

147. Officers' subsequent unauthorized entry and search violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

148. As the sworn applicant for the warrant, officer Hammermeister and those who assisted him had an official duty to discover and disclose to the issuing magistrate whether he had identified the correct address or place to be searched and not the residence of an innocent third party.

149. Officer Hammermeister, sergeant Fraction, lieutenant Folino, and any other involved defendant officers reasonably knew or should have known that the intended target(s) of the warrant would not be found at plaintiffs' address.

150. Officer Hammermeister and the other officers had an official duty to reasonably investigate and verify information they received from the felonious John Doe about the target's whereabouts.

151. Such an inquiry was so simple to make by means of the sources listed above. Officer Hammermeister and other officers had multiple sources of information available to them at the time, had they bothered to use them.

152. But, on information and belief, officer Hammermeister and others recklessly did not conduct any investigation or verification or failed to conduct a reasonable one.

33

Hammermeister also did not present the search warrant to Lt. Folino for review and approval before it was executed or Lt. Folino did not review or approve it before it was executed, thus failing to ensure that officer Hammermeister had performed an independent investigation and that probable cause existed.

153.    Consequently, in his complaint for search warrant defendant Hammermeister identified the wrong address, plaintiffs' address, a place he never had probable cause to enter and search.  Because defendant officers recklessly and utterly failed to independently investigate and verify the place to be searched, theirs was not a good faith error.

154.    Lieutenant Folino did not timely review and approve officer Hammermeister's application for search warrant to ensure that he and other officers had performed their own investigation rather than relying solely on the informant, as required by CPD Special Order S04-19.

155.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

156.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

157.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for a search warrant before raiding and searching citizens' residence constituted an abuse of power and authority.  Defendant officers' actions – of relying solely on location information provided by a criminally active

34

confidential informant and not conducting their own investigation and surveillance - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

158.     Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

159.     In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

### COUNT IV – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U.S.C. § 1983
**(All Plaintiffs)**

160.     Plaintiffs re-allege paragraphs 1-26 and 39-103 above and incorporate them into this count.  They assert this claim against all defendant officers who entered and/or searched their apartment – officers Calderon, Smith, Cintron, Wallace, Miller, Johnson, Sergeant Jefferson, Ward, Phillips, Sergeant Fraction and Hammermeister.

161.     The manner in which officers conducted their entry into and search of plaintiffs' apartment was objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

162.     For example, when these officers entered plaintiffs' apartment, they forcefully entered plaintiffs' building and apartment without knocking and announcing themselves or their office in circumstances where it was required, they screamed and cursed at

35

plaintiffs, they intentionally damaged or destroyed plaintiffs' personal property, and they did nothing to arrange for repair of the damage.

163. Further, it was unreasonable under the circumstances for officers to detain plaintiffs for an hour, an unreasonable length of time, and in an unreasonable and humiliating manner - pointing guns at Sharon, 4-year-old Lillie and autistic Julius, making them get down on the floor, sequestering terrified Lillie by herself and keeping her separated from her from her grandmother.

164. Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

165. Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

166. As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

167. Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs. Defendant officers' shocking displays of force against a totally unarmed family constituted an abuse of power and authority. Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

168. Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others. Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of

36

plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

169.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

**COUNT V – UNCONSTITUTIONAL SEIZURE OF PROPERTY – 42 U.S.C. § 1983**
**(Plaintiff Sharon Lyons Only)**

170.    Plaintiff Sharon Lyons incorporates paragraphs 1-26 and 39-103 above and asserts this claim against defendant officers Cintron, Johnson, Sgt. Jefferson, Ward, Phillips, and Sgt. Fraction who damaged or destroyed her doors, door paneling, microwave and other personal property when they forcibly entered her residence.

171.    As set forth above, defendant officers unnecessarily and willfully damaged or destroyed this property during the course of their entry.  Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them compensation for damage or destruction they caused.

172.    Defendant officers' actions constituted an unreasonable seizure of plaintiff's property, in violation of her rights under the Fourth Amendment and Fourteenth Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

173.    Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

174.    Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

175. As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including deprivation of their right to property, financial harm and emotional distress.

## COUNT VI – ASSAULT – STATE LAW
### (All Plaintiffs)

176. Plaintiffs re-allege and incorporate paragraphs 1-26 and 39-103 above in this count. They assert this claim against defendant officers Calderon, Cintron, Johnson, Sgt. Jefferson, Ward, Phillips, and Sgt. Fraction who entered plaintiffs' apartment and pointed their firearms directly at plaintiffs.

177. The actions of the defendant officers set forth above, including pointing guns at close range at the plaintiffs, created reasonable apprehensions in plaintiffs of immediate, unauthorized, and harmful contact to plaintiffs' persons. Because defendants did not have probable cause to enter plaintiffs' residence to begin with and because defendants' use of force was excessive in any event, it was not lawfully authorized.

178. The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

179. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

180. The conduct of defendants in entering and executing a residential search warrant and pointing guns at the residents is generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

181.     The officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

182.     Plaintiffs have been seriously harmed by officers' actions.

**COUNT VII – INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS – STATE LAW**
(All Plaintiffs)

183.     Plaintiffs re-allege and incorporate paragraphs 1-26 and 39-103 above in this count and assert this claim against defendant officers Calderon, Cintron, Johnson, Sgt. Jefferson, Ward, Phillips, and Sgt. Fraction who entered plaintiffs' apartment and pointed guns at them.

184.     The actions, omissions and conduct of defendant officers set forth above – including but not limited to pointing guns at plaintiffs, including Lillie and Julius – were extreme and outrageous and exceeded all bounds of human decency.

185.     Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

186.     Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs' family, which included a young child and severely autistic man, were especially vulnerable and fragile.

187.     As a direct and proximate result of officers' extreme and outrageous conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

188. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

189. The conduct of defendants in entering and executing a residential search warrant and pointing guns at residents are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

190. Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

## COUNT VIII – TRESPASS – STATE LAW
### (All Plaintiffs)

191. Plaintiffs re-allege paragraphs 1-26 and 39-103 above and incorporate them in this count. Plaintiffs assert this claim against defendant officers Calderon, Smith, Cintron, Wallace, Miller, Johnson, Sergeant Jefferson, Ward, Phillips, Sergeant Fraction and Hammermeister who entered plaintiffs' apartment.

192. By obtaining and executing a search warrant when they did not actually have probable cause to believe that drugs were being sold from plaintiffs' apartment, officer Hammermeister and other defendant officers were not lawfully authorized to enter upon the premises and, thus, they physically invaded plaintiffs' right to and enjoyment of exclusive possession of their residence.

193. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or

40

which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

194.     The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

195.     Officers' actions caused a physical invasion of plaintiffs' residence.

196.     Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT IX – *RESPONDEAT SUPERIOR* – STATE LAW
### (All Plaintiffs)

197.     Plaintiffs re-allege paragraphs 1-26, 39-103 and 168-205 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago.

198.     In committing the acts and omissions alleged above, defendants officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

199.     Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

## COUNT X – INDEMNIFICATION – STATE LAW
### (All Plaintiffs)

200.     Plaintiffs re-allege and incorporate paragraphs 1-26, 39-103 and 168-205 above.  Plaintiffs assert this count against defendant City of Chicago.

201.     Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

202.     Defendant officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

## PRAYER FOR RELIEF (ALL COUNTS)

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

a.     Compensatory damages;

b.     Punitive damages where pled in the counts above;

c.     Reasonable attorney's fees and litigation costs and expenses; and

d.     Such other or further relief as the Court deems just.


Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
53 W. Jackson Blvd., Suite 432
Chicago, IL 60604
(773) 241-5844
al@alhofeldlaw.com
zach@alhofeldlaw.com

42

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.<br>
Al Hofeld, Jr.

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.<br>
Al Hofeld, Jr.

43

## <u>CERTIFICATE OF SERVICE</u>

I, Zachary J. Hofeld, an attorney, certify that on April 6, 2023, I filed the foregoing ***Third***

***Amended Complaint*** using the Court's CM/ECF system, which effected service on all counsel of

record listed below.

/s/ Zachary J. Hofeld

*Plaintiffs' Attorneys*
Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
53 W. Jackson Blvd., Suite 432
Chicago, IL 60604
(773) 241-5844
al@alhofeldlaw.com
zach@alhofeldlaw.com